Rouse, J.
INTRODUCTION
In this action, the plaintiff, WHTR Real Estate Limited Partnership (WHTR), as assignee of Commerce Way Limited Partnership seeks to collect money owing under a commercial lease from Venture Distributing, Inc., f/k/a Landsdowne Ltd., Inc. (Venture) as lessee, and from United Liquors, Ltd. (United) as guarantor of the lease. WHTR contends that Venture defaulted for failing to pay rent and other amounts due under the lease. Venture responds that the landlord unreasonably withheld its consent to sublet the premises and *472 consequently failed to comply with the terms of the lease. Venture also alleges violations of G.L.c. 93A and raises numerous defenses. After a trial, without jury, and based upon all of the credible evidence, stipulations, and fair inferences therefrom, the court makes the following findings of fact, rulings of law, and order for judgment.
FINDINGS OF FACT
1. On February 23, 1994 Commerce Way Limited Partnership (Commerce Way or landlord), as lessor, entered into a lease (the lease) with Landsdowne Ltd., Inc. (Landsdowne), n/k/a Venture, as lessee, for the use of 47,250 square feet of warehouse space located at 110 Commerce Way (the premises), one of several buildings in a complex known as the Commerce Way Business Park in Woburn, Massachusetts (the Complex). The lease was for an initial term of 36 months commencing March 1, 1994 and ending February 28, 1997.
2. On February 23, 1994 United, a wholesaler and importer of alcoholic beverages, executed a guaranty of the lessee’s obligations under the lease. Venture has been a wholly owned subsidiary of United since 1994.
3. After executing the lease, Landsdowne changed its name to Venture. Venture is a wholesaler of nonalcoholic beverages and used the premises for the storage of non-alcoholic beverages.
4. The lease granted Venture the right to sublet the premises, subject to the landlord’s consent “which consent shall not be unreasonably withheld or delayed.” The subletting-assignment provision of the lease states, in relevant part:
Lessee shall not assign, sublet ... or encumber (collectively referred to as “Transfer”) . . . this lease without Lessor’s prior written consent, which consent shall not be unreasonably withheld or delayed. Lessor’s refusal to consent to a Transfer for any use or purpose other than specifically stated in Paragraph 8 shall not be deemed to be an unreasonable withholding of consent. In the event the Lessee desires to Transfer this lease to a new lessee to whom Lessor is required to give its proposed reasonable consent pursuant to the foregoing paragraph, Lessor shall have the option of either (1) allowing the lessee to Transfer this Lease, in which case Lessee shall remain primarily liable upon all the terms, conditions and covenants hereof, will deliver to Lessor an instrument executed by the Transferee binding the same to the terms and provisions of this lease and will pay the Lessor the amount by which the sum of rent, additional rent due to taxes and all other money or consideration it received from a Transferee exceeds the sum of all monetary obligations which Lessee owes to Lessor for the period of such Transfer; or (2) terminating this lease and relieving Lessee of all its future obligations hereunto provided that upon receipt of written notice from Lessee of Lessor’s intention to terminate the lease, Lessee may withdraw its request for consent... in which event this lease shall continue in full force and effect without any transfer of the same. In the event of such termination, Lessee shall be relieved of all future obligations hereinafter as of the date of termination. In the event the lease is terminated, as hereinafter provided, Lessor shall be free to enter into a new lease with a proposed new tenant or anyone else on whatever terms and conditions it chooses.
5. In 1995, WHTR, formerly known as WHBB Real Estate Limited Partnership, acquired the mortgage on the Complex and the right to collect all amounts due under the lease from Venture and under the guaranty from United. WHTR’s long-term plan was to sell the Complex at the highest price possible and an integral part of that plan was to have the Complex fully occupied at the highest rent possible at the time of sale. To that end, WHTR hired J.E. Robert Companies to manage the Complex, which in turn, hired Fallon, Hines & O’Connor (Fallon Hines), commercial real estate brokers, to lease vacant space, retain existing tenants, and “maximize income on the property.”
6. In early 1996, Venture determined that it no longer needed to occupy the premises and could save approximately $300,000 annually if it vacated the premises and consolidated its operations at another facility. Lewis Gack (Gack), Vice President of both Venture and United, requested real estate broker Bruce A. Levine (Levine) to locate a subtenant for the premises.
7. In early 1996, USCO Distribution Services, Inc. (USCO), a company which provides inventoiy management and distribution services, was occupying and using warehouse and office space located on the Chelmsford, Massachusetts campus of one of its customers, Sun Microsystems, Inc. (Sun). Sun advised USCO that, in April 1996, it would have to vacate the warehouse space it was using to store computer parts for Sun.
8. In mid-March 1996 representatives of USCO toured the Woburn premises occupied by Venture. On March 15, 1996 Venture’s broker sent USCO a proposal or a letter of intent to lease the Woburn premises. Venture’s proposal provided that the Woburn premises would be delivered to USCO “as is” and would be subleased at $3.75 square foot for the initial year and $4.00 a square foot for each of two option years. This proposal also stated that it was “subject to a mutually agreeable Lease being negotiated between the two parties involved,” and that the proposal would expire on March 18 at 5 pm. This proposal was signed only by Venture’s broker, Levine; it was not signed by any officer or executive of Venture. Levine, as Venture’s broker, was not authorized to execute an agreement that would legally bind Venture.
9. USCO did not accept the March 15 proposal. On March 19, 1996 USCO forwarded a counterproposal *473 to Venture which added a list of conditions to Venture’s proposal. Specifically, USCO’s counterproposal added the following language to Venture’s proposal:
This proposal is also subject to the following:
1. Satisfactory review of Sublessor’s lease with Lessor.
2. Rent commencement May 15, 1996.
3. Consent of Lessor (if required) and Lessor’s Lender (if required) each of which shall be Sublessor’s responsibility.
4. Satisfactory review of adequate Phase 1 Environmental Site Assessment (to be provided by Sub-lessor) by Sublessee’s counsel. Satisfactory walk through and inspection by Sun Microsystems, Inc. and by Sublessor.
5. Sublessor to pay brokers’ fees.
6. Review and approval of final agreements & documents by Sun Microsystems, Inc.
7. Review and approval of final agreements & documents by Sublessee’s senior management team.
10. On or about March 21, 1996 USCO obtained a copy of the lease and guaranty from Gack.
11. Prior to March 22, pursuant to USCO’s request, Gack requested a 2 IE report from the landlord.
12. Venture did not respond to USCO’s March 19 letter. On March 22, 1996 an attorney for Venture, Thomas Bennett (Bennett), prepared a draft sublease and forwarded it to USCO’s in-house counsel. The terms of that sublease make no reference to the conditions that USCO added to the March 15 proposal. One of the provisions of the sublease required USCO “to perform each and every obligation of the Sublessor as lessee under the lease except for the payment of rent.” Glenn Sauder (Sauder), an executive at USCO who had primary responsibility for finding new space, never saw the lease until his deposition was taken in this case. Also on March 22, 1996, Gack, without discussing with USCO its counterproposal or Venture’s proposed sublease, forwarded to the landlord, through the landlord’s property manager, a copy of the proposed sublease with the following notation: “Please examine Sublease and sign consent if agreeable. Have you made any progress on 2IE Study? Please call me if I can be of any help.”
13. The landlord then contacted Fallon Hines to deal with the matter of the Venture sublease. Shortly thereafter, Jerome Kyllingstad (Kyllingstad) of Fallon Hines called Gack and asked him to provide to WHTR a financial statement on USCO as well as some other information.
14. In response to that request, Gack obtained a Dunn & Bradstreet report on USCO but did not forward it to Kyllingstad until April 12. Kyllingtstad, on at least one occasion, between March 15 and April 12, reiterated his request to Gack to provide a first hand financial statement on USCO but one was never provided. No one from Venture ever asked Sauder to provide financial information on USCO.
15. At the same time that USCO was pursuing a possible relationship with Venture it also was considering other properties in Littleton and one in Chelms-ford owned by a company called Freudenberg Nonwovens, Ltd. (Freudenberg). On Februaiy 12, Freudenberg sent its first proposal to USCO with respect to leasing the Chelmsford property. Initially, of all the properties USCO was considering, the Wo-burn premises appeared to be the most attractive due to the rental rate, the date the space would be available, and the building itself. Location and price were important factors.
16. After forwarding the March 19 counterproposal to Venture, USCO began a due diligence process with respect to the premises. As part of that due diligence, Sauder conducted a “walk-thru” of the Woburn premises on March 26, 1996 and thereafter prepared a list of 17 items that “need repair/testing prior to [USCO’s] signing a lease.” The next day, Sauder forwarded this “walk-thru” list to Levine through USCO’s broker, Andrew Nelson (Nelson). However, Venture did not receive the list until April 11 from Sauder. USCO was willing to discuss these items with Venture to resolve who would be responsible for payment but Venture and USCO never came to agreement on these items. Gack conceded at his deposition that he had no idea how much these items would cost. USCO was not willing to sublet premises “as is.”
17. USCO had the premises reviewed by a security consultant on March 25,1996 who found the premises to be secure for USCO’s intended business functions.
18. Despite numerous requests, Venture never provided USCO a Phase 1 Environmental Site Assessment as requested in the March 19 letter. As USCO’s counsel said: USCO “required” this information “before USCO would sign the lease.” After many requests, and at its own expense, USCO, on March 26, took steps to obtain its own site assessment.
19. On April 3, 1996 USCO received a summary of the environmental report. That report revealed, among other things, that land adjacent to the premises contained contaminated fill and that there was a solid waste landfill one-half mile from the premises. USCO’s counsel concluded that the assessment was not satisfactory, that USCO should pursue alternative locations to the Woburn premises and that USCO should only enter into a sublease which contained adequate environmental indemnification language backed by adequate financial resources.
20. Beginning in early April, the pace of negotiations between Freudenberg’s and USCO’s brokers picked up speed and draft proposals were exchanged. On April 3, Freudenberg sent a proposal of lease terms to USCO. USCO countered on April 4, Freudenberg *474 responded with another proposal on April 5, and USCO forwarded yet another proposal on April 9.
21. There was no communication between Venture and USCO about Venture’s proposed sublease until April 10, when USCO’s general counsel responded by forwarding his own draft sublease to Venture’s counsel. Among the changes that USCO’s counsel made to the Venture draft sublease were proposals that seven sections of and two addendums to the lease would be excluded from USCO’s obligations. In particular, USCO sought relief from complying with: 10. Use of the Leased Premises; 18. Indemnification; 23. Surrenders; 26. Holdovers; 27. Liability and 28. Non-waiver Provision; 34. Lender Approval of Lease; and from Addendum #2 Lessor’s Improvements, and Addendum #4 Hazardous Waste. Section 10 obligated the lessee to use the premises “only for the purpose of warehousing and distributing alcoholic and non-alcoholic beverages and the items related to the beverage trade but for no other purpose.” USCO wanted to lease the space to store computer-related products. USCO also added seven paragraphs imposing additional obligations on the landlord related to environmental issues. One of those paragraphs, paragraph 7.4, included a requirement that the sublessor, lessor and its successors and assigns indemnify the sublessee from any claims or damages related to the violation of any environmental laws or any hazardous substance existing on the leased premises prior to the sublessee’s occupancy. USCO proposed to exclude Addendum 4 which would have obligated it to indemnify the landlord from any costs, claims, and liability caused by hazardous substances arising out of USCO’s action or inaction. USCO also proposed to exclude an indemnification provision in the lease which would have obligated it to indemnify the landlord from claims related to personal injury and property damage except those arising out of the negligence or fault of the landlord.
22. The cover letter accompanying this draft sublease indicated that USCO intended its sublease to clarify several matters with respect to the parties’ proposed relationship. The letter also stated that the draft remained subject to the review, comment, and approval of the USCO management team and that it was not an offer capable of acceptance. Further, the cover letter stated that it would not be binding unless it was fully executed by the “Lessor, Sublessor, and Sublessee.” The draft sublease was not signed. The cover letter also said that USCO would like to bring “this matter to closure by April 15 if possible.” USCO’s sublease gave the landlord 15 days to approve the sublease after it was executed by Venture and USCO.
23. By letter dated April 10, 1996 Bennett advised the landlord’s counsel that Venture was vacating the premises on April 12 and “that if USCO does not sublet the Leased Premises due to a refusal by the Lessor to consent to the Sublease, [Venture] will take the position that they have no further obligations under the Lease due to the breach by the Lessor of its obligations to reasonably and seasonably consent to the Sublease.”
24. USCO never informed Venture that USCO would execute the USCO draft sublease or the Venture sublease. USCO and Venture never executed any sublease or even came to any agreement, oral or written, about the terms of a sublease.
25. On or about April 12, 1996, Bennett, without discussing the proposed sublease with USCO, forwarded the USCO draft sublease to the landlord who then forwarded it to Kyllingstad. He did not forward a copy to Gack. Later that same day, Kyllingstad had a phone conversation with Gack in which Kyllingstad said that Gack was not getting the 2 IE report and the landlord was not required to consent to the sublease and would not do so. According to Gack, Kyllingstad said: “[TJhis deal is never going to happen” which Gack took to be the USCO draft sublease. Kyllingstad offered no explanation as to why the landlord would not consent to the sublease. Gack was very angiy and upset at this news.
26. On April 10, Freudenberg’s broker informed USCO’s broker that USCO’s counterproposal of April 9 had been accepted and that Freudenberg would begin drafting a lease. On April 15, USCO’s broker sent a fax to USCO’s counsel that USCO’s counterproposal to Freudenberg had been accepted.
27. After the April 12 phone conversation between Kyllingstad and Gack Venture and USCO ceased negotiations. At some point in time, the landlord, through Fallon Hines, contacted USCO directly with a proposal for a lease for a term of five years at a rent of $4.15 a square foot, higher than that being negotiated for the Venture/USCO sublease at $3.75 a square foot the first year and $4.00 the next two years. The testimony of Kyllingstad and Gack is at odds over whether Gack consented to the landlord speaking directly to USCO about a lease. It is not necessaiy for the court to resolve this credibility issue because the lease did not prohibit such dealings and Gack’s permission was not needed.
28. On April 17, USCO forwarded a proposal to the landlord through Fallon Hines. USCO did another walk-thru on April 16. Thereafter, Sauder prepared a second list of items still to be resolved. Among the items to be addressed were the inadequacy of the heater and an inspection of the roof.
29. At sometime in late April, Bennett talked to Douglas Brown, corporate counsel for USCO, and told him that the landlord would not consent to a sublease. The landlord was not willing to make the improvements to the space which USCO wanted. USCO, for its part, had concerns about environmental matters, the sprinkler system, the removal of an internal wall, whether traffic on Routes 3 and 128 would adversely affect delivery times and the commute of employees from New Hampshire, and other matters. USCO and WHTR never reached agreement on the terms of a lease.
*475 30. On or about April 18, 1996 the landlord, through Fallon Hines, informed Venture’s counsel it would release Venture from the lease only upon payment by Venture of a $50,000 “termination fee” which included monies to repair damage to the premises above normal wear and tear and to clean the building. Kyllingtsad said there was a “fair amount of damage” in the space including damage to walls, inoperable lights, holes in the floor, and dirt and debris.
31. On April 29, 1996 USCO entered into a lease for space at the Freudenberg Building in Chelmsford. USCO said that it needed to make a decision because it had to vacate the Sun premises. The Freudenberg lease contained a provision holding USCO harmless from any liability related to any environmental cleanup or damages pre-existing on the premises or caused by the lessor.
32. Venture vacated the premises in mid-April.
33. On May 8, 1996 WHTR sent Venture and United a notice of default for non-payment of rent.
34. On June 5, 1996 WHTR terminated the lease and sent Venture and United a notice of termination for non-payment of rent.
35. Neither Venture nor United paid any rent or other amounts due under the lease for the ten-month period beginning May 1, 1996 and ending February 1997. The amounts due under the lease, including base rent, real estate taxes, and operating costs for that period is the sum of $171,119.91.
RULINGS OF LAW
WHTR contends that Venture defaulted on the lease and failed to pay the rents and other amounts due under the lease from May 1996 to the end of the lease term in February 1997. Venture’s primary defense is that the landlord unreasonably withheld its consent to a sublease with USCO, thereby relieving Venture of its contractual obligations. Venture has also alleged that WHTR violated G.L.c. 93A by acting in bad faith when it refused to consent to the sublease.
The question of whether the landlord was required to consent or to approve a proposed sublease with USCO begins with the question of whether there was an agreement or sublease for the landlord to approve. Neither the March 15 proposal made by Venture nor USCO’s coun-terproposal of March 19 constitutes binding agreements. Venture’s March 15 proposal was not accepted by USCO and its terms expired the day before USCO forwarded a counterproposal to Venture with a list of added conditions. Even ifUSCO had accepted the March 15proposal, it was signed only by Levine who was not authorized to bind Venture. Both proposals stated that they were subject to a mutually agreeable lease being negotiated between the two parties involved.
Venture and USCO never agreed to the terms of a sublease or mutually executed a sublease. The draft sublease prepared by Venture’s counsel and forwarded to USCO on March 22 did not address USCO’s counterproposal and conditions. Venture’s counsel did not discuss this draft sublease with USCO nor did USCO discuss with Venture the provisions of the draft sublease which it forwarded to Venture on April 10— nineteen days later. The cover letter accompanying the USCO draft sublease expressly stated that the draft was not an offer capable of acceptance and would not constitute an agreement unless fully executed by WHTR, USCO and Venture. The terms and conditions USCO included in this draft reveal that there was no meeting of the minds with Venture on a contemplated sublease. Without discussing or negotiating this draft sublease, Venture forwarded it to the landlord without signing it or even conveying acceptance of those terms to USCO. Attached to this draft sublease, was the list of items that needed repair or testing prior to USCO’s signing a lease. There was never any resolution as to who would bear the responsibility and expense for attending to those items. The terms of a sublease were never agreed to by USCO arid Venture.
Furthermore, USCO never agreed to be bound by the terms of the lease between the landlord and Venture. USCO’s draft sublease sought to relieve USCO of obligations under seven sections of and two addendums to the lease and to add to the lease new obligations for the landlord. USCO proposed to substitute its own use and assignment clauses for those contained in the lease. The latter clause permitted USCO to transfer its interest in the sublease to Sun without the lessor’s consent. One of the most significant conditions USCO added to its proposal was satisfactory review of an adequate Phase 1 Environmental Site Assessment. Venture never provided such an assessment to USCO who finally took the initiative, at its own expense, to obtain a site assessment. After receiving the environmental report, USCO’s counsel concluded that a sublease should be entered into only with adequate indemnification language. USCO subsequently included such language in its draft sublease which it forwarded to Venture on April 10. In its draft sublease USCO sought to exclude Addendum 4 which required Venture to indemnify the landlord for claims related to hazardous substances caused by the lessee’s action or inaction.
Absent a landlord’s agreement to the contrary, the terms of the commercial lease to which a tenant has contracted are binding on a subtenant, including the use clause. See Worcester-Tatnuck Square CVS, Inc. v. Kaplan, 33 Mass.App.Ct. 499, 503-06 (1992). Until USCO agreed to be bound by the lease, WHTR was under no obligation to even consider approving a sublease to USCO. See Friedman on Leases (4th ed.) Section 7.304b: A “ [ljandlord is not in default for failure to consent to an assignment or sublease unless tenant produces a candidate ready, willing, and able to fulfill obligations.” See also Worcester-Tatnuck Square CVS, Inc., supra at 503-06.
Venture contends that WHTR scuttled the Venture-USCO negotiations by arbitrarily refusing to consider any sublease between Venture and USCO and this *476 prevented the parties from reaching agreement. Venture and USCO were not even close to agreement by April 12, the date Kyllingstad told Gack that the landlord would not consent to the sublease. Although Venture certainly wanted to reach an agreement with USCO it was less than diligent in pursuing its own interests. Venture’s counsel did not incorporate any of the terms of USCO’s counterproposal into Venture’s draft sublease or call USCO’s counsel to discuss Venture’s draft sublease. Neither Gack nor Venture’s counsel discussed the terms of USCO’s draft sublease with USCO or with the landlord. Gack never sent the requested financial statement to Kyllingstad and waited until April 12, just three days before USCO wanted to bring the matter to closure, to send a Dunn & Bradstreet report. Venture’s broker never forwarded the walk-thru list to Gack. Venture’s counsel did not forward USCO’s draft sublease to Gack who was therefore not aware during his April 12 conversation with Kyllingstad that it gave the landlord 15 days after Venture and USCO signed to determine whether to consent.
This lack of follow through and passivity is surprising in light of the time pressures on both Venture and USCO. As of April 10, when Bennett sent a letter to the landlord, neither Venture nor USCO had approved a sublease even though Venture was intending to vacate on April 12 and wanted USCO to take occupancy on April 15. Venture had almost 30 days after it sent USCO its first proposal to reach agreement with USCO on the terms of a sublease. There is no evidence that the parties were even close to resolving the terms of the sublease, not to mention agreement that USCO would be bound by all terms of the lease: Nor is there any evidence that USCO and Venture had agreed on the terms of the sublease orally and simply needed to reduce them to writing'. Venture argues that “the parties ultimately might have agreed that USCO would be bound to all provisions of the lease” but this matter is left to speculation. There were too many uncertainties and unresolved issues to legally bind either USCO or Venture. It was incumbent on Venture to secure a subtenant ready, willing, and able to perform Venture’s obligations under the lease. This it did not do. There never was a legally enforceable agreement between Venture and USCO to which the landlord could consent.
USCO appears to have had a genuine interest in the premises and moved forward in good faith but due to increasing concerns about the suitability of the premises and time constraints it entered into a lease with Freudenberg. Furthermore, USCO was never fully committed to entering a sublease with Venture and was keeping its options open by exploring other properties, most particularly, the space in Chelmsford owned by Freudenberg. USCO was attempting to locate space on a tight timetable. From March 22 to April 10, USCO and Venture were not discussing or negotiating the terms of their proposed relationship. During this same time period USCO’s negotiations with Freundenberg were frequent and included the exchange of several proposals and counterproposals.
For all of the foregoing reasons, there was no sublease for the landlord to approve, and it did not breach the lease by refusing to consent to a sublease with USCO. Therefore, Venture breached the lease by failing to pay the sums due under the lease from May 1, 1996 until the end of the lease term in February 1997, a sum of $171,119.91.
G.L.c. 93A
Venture contends that the landlord violated G.L.c. 93A by arbitrarily refusing to consent to the proposed subtenancy of USCO. Although Kyllingstad’s refusal to explain why the landlord was not going to approve “this deal” inflamed Gack and made it difficult for the parties later to resolve their dispute without resorting to litigation, it did not rise to the level of a G.L.c. 93A violation because there was no “deal” for the landlord to approve. The fact that the landlord attempted to negotiate directly with USCO and at a rental value higher than that proposed by Venture does not establish a violation of G.L.c. 93A because the lease did not prohibit such dealings and there is no evidence that a demand for higher rent was made in order to chill interest by USCO in subleasing the premises from Venture.
Similarly, there is no merit to the counterclaim that the demand for a “termination fee” in exchange for a release from liability constituted an unfair and deceptive trade practice. Since it was Venture which breached the lease by failing to pay the sums due under the lease, it was liable for all amounts through the end of that lease term. The fact that the landlord requested that Venture pay an amount less than it was obligated to pay under the lease to cover some of its damages cannot be deemed to violate G.L.c. 93A. Additionally. Venture had damaged the premises above that of normal wear and tear and it was obligated under the lease to maintain the premises in good condition.
And finally, assuming WHTR had a duly to mitigate its damages by attempting to relet the premises after Venture vacated in April, Venture failed to satisfy its burden that WHTR did not take all practicable steps to minimize its losses.
Given the court’s determination that it was Venture which breached the lease, it is not necessary for the court to address Venture’s other counterclaims or defenses, all of which shall be dismissed.
ORDER FOR JUDGMENT
For all of the following reasons, it is hereby ORDERED that judgment shall enter for the plaintiff WHTR Real Estate Limited Partnership against the defendants Venture Distributing, Inc. and United Liquors, Ltd. in the amount of $171,119.91 together with interest and costs. It is further ORDERED that the counterclaims of the defendants Venture Distributing, Inc. and United Liquors, Ltd. be dismissed.